FILED

2007 May-11  AM 09:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN  DIVISION

| | | |
|---|---|---|
| **JAMES FAIRRIS,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **2:06-CV-290-VEH** |
| **CITY OF BESSEMER,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on: (1) Plaintiff James Fairris' Motion for Summary Judgment (doc. 15); and (2) Defendant the City of Bessemer's Motion for Summary Judgment (doc. 18).  These motions have been briefed and are ripe for review.  For the reasons articulated herein: (1) Plaintiff's Motion for Summary Judgment is due to be **DENIED**; and Defendant's Motion for Summary Judgment is due to be **GRANTED**.

## I.    FACTS[1]

Plaintiff, James Fairris, is the Environmental Coordinator for Bessemer Utilities, which is operated by Defendant, the City of Bessemer.  Bessemer Utilities

---

[1] The question presented in this case is whether Fairris is exempted from the overtime requirements of the Fair Labor Standards Act ("FLSA") by virtue of the professional or administrative exemptions of the FLSA.  The parties contend, and the court agrees, that the material facts of this case are not in dispute.

provides water and electrical service for the City of Bessemer.  The Operations Manager for Bessemer Utilities is Charles Nevins.  Nevins oversees the day-to-day activities of the Utility and reports to the Mayor of Bessemer.

Fairris is paid a salary of $60,000 per year.  As long as Fairris has been the Environmental Coordinator for Bessemer Utilities, he has been paid an annual salary. In 1995, the Defendant began paying Fairris extra compensation, in the form of "straight-time overtime," for any hours he worked over 40 during a work week.  In other words, in addition to his salary, the Defendant paid Fairris an hourly rate, figured by dividing his weekly salary by 40 hours, for the hours he worked beyond 40.  Fairris was never paid "time and a half" by the Defendant.  The practice of paying straight-time overtime continued until 2005.

In early 2005, the Mayor of Bessemer, Ed May, hired an outside law firm to investigate the Defendant's practice of paying straight-time overtime.  The law firm recommended that a number positions not be paid overtime of any kind because those positions were exempt from the FLSA for overtime purposes.  Fairris' position of Environmental Coordinator was included in the recommendation and, in November 2005, the Defendant stopped paying Plaintiff straight-time overtime for hours over 40.  Fairris contends that he is not exempt from the FLSA, and that he should be paid overtime at the rate of time and a half.

2

In 1957, Fairris received his Industrial Management degree from the School of Engineering at Auburn University, which was then known as Alabama Polytechnic Institute.  The Department of Industrial Management awarded a degree which "has the effect of giving the Industrial Management graduate a broad background which enables him to better understand his physical and social environment, coupled with a specialized background which enables him to make managerial decisions, realizing the effect of these decisions on all parts of the industrial operation. This program, therefore, is training professional managers – men [sic] whose life work will be devoted to the operation and improvement of this nation's industrial enterprises." (Auburn University's Self Study re: Industrial Management, Part B – Present Status Tab 8).  Auburn described the objective of the Industrial Management Degree as follows:

> Management in modern industry or government is a profession. Its functions are to plan, organize, direct and control activities of workers and specialists in achieving some common purpose most effectively and economically. It must deal with problems of technical engineering efficiency, of the industrial economy, and profitability, and especially the effectiveness of human effort. The curriculum leading to the Degree of Bachelor Industrial Management has been designed with these needs of the profession in mind.

(Auburn University Self-Study re: Industrial Management, 1962 – Objectives, p. 5 Tab 8).  Fairris's degree does not qualify him to become a licensed engineer in the

State of Alabama.

Before his employment with the Defendant, Fairris held three previous employment positions for which he was classified as an "engineer." Fairris served as a Construction Engineer IV for approximately 13 years with Daniel Construction Co., where he supervised eight construction engineers. (DX 1, Tab B Employment Application to Jefferson County Personnel Board at 2-3). Plaintiff served as a Plant Industrial Engineer for approximately six years with National Spinning Company. He was also an Industrial Engineer and Senior Staff Industrial Engineer with Beaunit Fibers Company. (Id.) At Beaunit, Plaintiff was exposed to an environmental safety program, taking samples for laboratory work and microbiological analysis on water samples. (Pl. Dep. 94-96). Also prior to his employment with Bessemer Utilities, Plaintiff served as a Plant Superintendent for roughly two years. He supervised the work of 20-30 employees in the manufacture of chemical bricks and was responsible for filing quarterly reports with the state department of environmental management. (DX1, Tab B at 3). The reports measured whether or not discharged water was acidic or corrosive. (Pl. Dep. 46).

The Defendant first retained Fairris to serve as Environmental Coordinator on an independent contractor basis in August, 1990. (Pl. Dep. 12-13, DX 1, Tab A – Contract to Employ Utility Environmental Coordinator). The Defendant employed

Fairris to establish and maintain an environmental compliance program and a routine cross-connection program, commonly referred to as backflow, to detect and prevent contamination in the Defendant's water service.  (Pl. Dep. 18-19, DX 1, Tab A at 1-2).  During his employment with the Defendant, Fairris developed his knowledge of environmental compliance by studying Environmental Protection Agency ("EPA") and Alabama Department of Environmental Management ("ADEM") regulations, visiting other city utility departments, and attending programs or seminars sponsored by EPA and ADEM.  (Pl. Dep. 29).

After Fairris was hired as an employee of the Defendant in 1992, Fairris's job of Environmental Coordinator became a classified position subject to the jurisdiction of the Personnel Board of Jefferson County.  (McCullough Affidavit ¶ 6).

Fairris is a licensed Water and Water Waste Treatment Operator.  (DX1, Tab H at 4).  Fairris received his Grade I Water Certification from ADEM in August 1992.  (Pl. Dep. 55).  Fairris is required to have 24 hours of continuing education every three years to maintain his Water Certificate.  (Pl. Dep. 58-59).  Fairris has attended a number of seminars and courses directly related to his employment with the Defendant. When Fairris was first hired, he attended two seminars sponsored by the EPA or ADEM on PCBs.  (Pl. Dep. 24-25).  Fairris attended backflow seminars in Colorado and in Cullman, Alabama.  (Pl. Dep. 29-31).  Fairris attended a school in

Prattville, Alabama on backflow testing, to learn the terminology.  (Pl. Dep. 32).

Fairris wrote the Environmental Coordinator job description for the Personnel Board of Jefferson County.  He is the only person to hold that job.  The 2002-2004 Environmental Coordinator Class Specification includes sections on job summary, essential functions, supervision exercised, knowledge, skills and abilities required and compensable qualifications.  (DX 1, Tab F).

The Job Summary provides in pertinent part:

Work involves overseeing the environmental safety program for the electric and water divisions of the Bessemer Utilities Department … Work also involves ensuring compliance with local, state, and federal environmental regulations and supervises and operates the water quality testing lab … The employee plans and carries out the assignment, resolves most of the conflict that arises, and coordinates the work with others, as necessary; also interprets policy on own initiative in terms of established objectives.

(DX 1, Tab F).

The Essential Functions of Work includes the following:

Plans, organizes, implements, and monitors an environmental safety program for the Bessemer Utilities Department … ensures compliance with Environmental Protection Agency and the Alabama Department of Environmental Management Regulations.  Oversees and operates the water quality testing laboratory; develops, implements, and oversees water quality sampling program; ensures water samples are obtained and analyzed according to EPA and ADEM requirements; uses water quality testing equipment to perform microbiological analysis, including heterotrophic plate count, sterility, pH tests, electronic balance, alkalinity, conductivity, free chlorine residual tests, and pH verification

6

tests … provides water quality information to public and customers; receives, investigates on-site or in lab, and reports on customer water quality complaints. Monitors water and backflow program; ensures that residential and business customers obtain the appropriate backflow device; ensures all business backflow devices are inspected annually. Maintains appropriate records; prepares reports for Operations Manager, Mayor, and Environmental Regulatory Agencies; participates in annual recertification review of lab… inspects electrical substations to determine the PCB level …

*Id*.

The Supervision Exercise section provides:

May assign, schedule, and review the activities of 1-3 clerical and paraprofessional employees to ensure proper water sampling and analysis.

*Id.*

The Knowledge, Skills, and Abilities section provides in part:

Knowledge of basic techniques of water quality sampling and analysis for effective water pollution control. Knowledge of environmental regulatory requirements of the EPA and ADEM … Knowledge of the operation of electric and water utilities distribution systems … ability to read, interpret, and utilize plumbing blueprints. Ability to plan, organize, and implement environmental safety programs.

*Id.*

The Compensable Qualifications section provides in part:

Possession of a Bachelor's Degree in Biology, Chemistry, Engineering, Industrial Management, or related field and three years of environmental work experience in a public or commercial utility which includes water sampling and analysis and PCB … inspections; or any combination of

7

education experience that demonstrates the above-listed knowledge, skills, and abilities.

*Id*.

At least once every five years, the Personnel Board conducts a survey to determine whether employees are properly classified. In other words, the survey process is designed to determine whether the duties actually performed by a particular employee are consistent with his or her job classification (i.e., title) as described in the Class Specification. (McCullough Affidavit ¶ 7). The first step in the Survey process is to obtain information from the employee(s) working in a particular classification. The Personnel Board uses a Position Description Questionnaire ("PDQ") for this purpose. (*Id.* at ¶ 8).

In 2003, Fairris submitted to the Personnel Board his responses to a PDQ. It was the Personnel Board's determination that the duties performed by Fairris are consistent with the Environmental Coordinator classification.

The PDQ first requires that the individual responding verify that his or her job summary is accurate. Fairris verified in the PDQ that his job summary was accurate. (DX 1, Tab G at 2 – PDQ).

The PDQ lists a number of tasks and then requires the individual completing the form to specify the frequency of the task completed, the importance of the task,

and the time spent performing the task.  The importance categories are "somewhat important," "very important," and "most important."  Plaintiff classified the following as his most important responsibilities:

> (1) Plans, organizes, and implements and monitors an environmental safety program for the Bessemer Utilities Department which serves approximately 40,000 electric and water customers; ensures compliance with Environmental Protection Agency and the Alabama Department of Environmental Management Regulations.

> (2) Oversees and operates the water quality testing laboratory, develops, implements, and oversees water quality sampling program; ensures water samples are obtained and analyzed according to EPA and ADEM requirements; uses water quality testing equipment to perform microbiological analysis, including heterotrophic plate count, sterility, pH tests, electronic balance, alkalinity, conductivity, free chlorine residual tests, and pH verification tests; cleans and maintains equipment, orders necessary equipment, materials, and supplies.

> (3) Maintains appropriate records; prepares reports for Operations Manager, Mayor, and environmental regulatory agencies; participates in annual recertification review of lab, sends routine correspondence as necessary.

> (4) Prepares DPPS report; CCR report, Center Survey for ADEM, calculate water loss monthly, annual report for ADECA.

*Id.* at 2-3.  Fairris indicated that he performed the first three tasks on an hourly basis and the fourth task daily.  *Id.*

The PDQ includes a section entitled Application of Authority and requires the individual completing it to select the highest level of authority that applies to his

9

position.  The numbers range between 1 and 8.  Fairris selected number 7, which provides: "I am responsible for developing, implementing, and maintaining programs of compliance for a department whose major purpose is to ensure compliance."  *Id*. at 6.  The meaning of or value assigned to the 1-8 range is not expressly stated by the parties.  The undersigned takes note that the evidence in this case creates the inference that a selection of a higher number indicates a higher level of authority while a selection of a lower number indicates that the employee has less authority.  By selecting 7, Fairris asserted that he is one number away from the highest level of authority attainable.

The PDQ also includes a section on Managerial/Supervisory Responsibilities Exercised.  It requires the employee to indicate the level of supervisory responsibility that applies to his position.  The selections range from 1 (no responsibility) to 4 (make decision on own authority).  Plaintiff indicated under managerial responsibility that he made decisions on his own authority under the following categories:

> Hire employees, establish rules, procedures, and/or standards, approve overtime and/or leave, evaluate performance, take disciplinary action, resolve complaints and/or grievances, direct and oversees [sic] the maintenance of filing and records system, processes [sic] and receives [sic] executions from Alabama courts, and participate in public information forums.

*Id*. at 7.

Fairris hired Michael Leavitt as a Lab Technician.  Fairris supervises Michael Leavitt.  (Pl. Dep. 135-137).  Fairris provides Leavitt feedback on job performance, corrects him, provides him advice, and informs the Operations Manager about his job performance.  (Pl. Dep. 139-140).  Fairris also provides Leavitt training, gives him work assignments, and approves his attendance in continuing education classes.  (Pl. Dep. 143-144).  If Leavitt needs a day off, he informs Fairris.  (Pl. Dep. 141).  Beside Leavitt, Fairris has hired, trained and supervised two other individuals.  (Pl. Dep. 172-174).

The PDQ also includes a section on Supervision/Direction Received.  An individual filling out the PDQ is required to indicate the type and amount of supervision his position receives.  The level of supervision ranges from 1, where the supervisor frequently checks job activities to 7 where the individual receives direction from the governing body only.  Plaintiff responded with the number 6, which provides:  "I receive executive direction from the head of the organization, and deal with potentially major controversies, emergencies, or crises."  (DX1, Tab G at 11).

Fairris testified at his deposition that his work, including the material he submits to ADEM and the EPA, is not reviewed by anyone.  (Pl. Dep. 157).  Fairris knows more than any other individual at Bessemer Utilities about environmental compliance and EPA and ADEM regulations.  (Pl. Dep. 158-159).

11

On average, Fairris spends approximately 78% of his time answering phones for water complaints, calculating invoices, ordering equipment, flushing fire hydrants, and similar tasks. (Fairris Aff., Exhibit A).  Fairris spends approximately 18% of his time taking samples of the water, testing samples in the lab and forwarding reports to the applicable agencies. (*Id.*).  Fairris contends that he spends the overwhelming majority of his time on clerical duties.  Defendant denies that Fairris is primarily responsible for taking customer complaints and other clerical duties.

Fairris cannot authorize significant expenditures; rather, either Nevins or the Mayor must authorize such expenditures. (Nevins Depo., p. 41; Fairris Affidavit, ¶ 15).  He can, however, authorize smaller expenditures such as giving soap powders to customers with water complaints and replacing a customer's ice machine.

## III.   STANDARD ON SUMMARY JUDGMENT[2]

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[2]Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  *See* Wright, Miller & Kane, *Federal Practice and Procedure* § 2720, at 327-28 (3d ed. 1998).

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its

13

initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.,* facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement

that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   DISCUSSION

The FLSA requires that employees be compensated at a rate of time and a half for hours worked in excess of 40 during the course of a week. *See* 29 U.S.C § 207(a)(1). The FLSA provides an exemption from the payment of overtime for "any employee, employed in a *bona fide*, executive, administrative or professional capacity." *See* 29 U.S.C. § 213(a)(1). The employer carries the burden of proving the exemption, and the overtime exemption provisions of the FLSA are narrowly

construed against the employer.  *See Jefferey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).

## A.   Learned Professional Exemption

"To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a).[3] This primary duty test includes three elements:

(1) The employee must perform work requiring advanced knowledge;

(2) The advanced knowledge must be in a field of science or learning; and

(3) The advanced knowledge must be customarily acquired by a

---

[3]The following professionals, following four academic years of pre-professional and professional study, generally meet the duties requirement for the learned professional exemption: registered nurses, dental hygienists, physician assistants, certified public accountants, chefs, athletic trainers, and funeral directors or embalmers.  29 C.F.R. § 541.301(e).  However, paralegals, bookkeepers, accounting clerks, and cooks generally do not qualify for the learned professional exemption.  *Id.*  Engineers qualify for the exemption.  *Id.*

Although not specifically enumerated in § 541.301, there are certain foundational factors that form the bedrock of the learned professional exemption.  The common elements among professionals who qualify for the learned professional exemption pursuant to § 541.301 are: (1) four years of specific pre-professional and professional study; and (2) some sort of licensing or accreditation requirement directly related to the specific profession and course of study.  *See* 29 C.F.R. § 541.301(e).  In addition, "the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy" maintain a recognized professional status.  29 C.F.R. § 541.301(c).  Each of the "traditional professions" require profession-specific study as opposed to a general education.  Professionals who obtain a general degree or who pursue study that is unrelated to the duties of their profession do not qualify for the learned professional exemption; therefore, a college degree alone is insufficient to qualify a person for the exemption.  *See* 29 C.F.R. § 541.301(e)(7).

prolonged course of specialized intellectual instruction.

*Id*.

There is also a requirement that the employee be compensated on a salary basis at a minimum amount. Plaintiff concedes that his salary compensation exceeds the minimum requirement.   (Plaintiff's Brief in Support the Motion for Summary Judgment, p. 13).

In order to determine whether the learned professional exemption applies, the court must first define the scope of Plaintiff's "primary duty."  The phrase "primary duty" is defined as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).

> Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id*.

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in

> this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700(b).

Defendants contend that Fairris's "primary duty" is that, "Plaintiff is responsible for overseeing and operating the water quality testing lab at Bessemer Utilities and Plaintiff does so by ensuring that water samples are obtained and analyzed according to EPA and ADEM standards." (Def. Response to Pla. MSJ; p. 10-11). Plaintiff's "primary duty" includes the establishment and maintenance of the Defendant's backflow program in that the backflow program is related to the water quality testing lab. (*Id*.). Fairris concurs with Defendants as to Fairris's "primary duty." Fairris's "duties were primarily to establish a backflow prevention program and also deal with PCB levels." (Plaintiff's MSJ; p. 16). "The backflow program simply consists of having each water user have a backflow prevention device so that if that particular user develops water quality problems those problems will not be spread into the general system." (*Id*.). "With respect to the PCBs, Fairris simply had to set up a system to take samples, test them and then report the level found to the applicable agencies." (*Id*. at 17). Based on the evidence on record, the court agrees with the parties and finds that Fairris's "primary duty" is to oversee and operate the

18

water quality testing lab and backflow program at Bessemer Utilities.[4]

Having determined Fairris's "primary duty," the three factor test articulated in 29 C.F.R. § 541.301(a), *supra*, must be applied. As the three part test is conjunctive in nature, a failure to meet any one of the three elements of § 541.301(a) will remove Fairris from the learned professional exemption to the FLSA.

"The phrase 'work requiring advanced knowledge' means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b). "An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id*.

---

[4]Following Fairris's admission as to his "primary duty," Fairris then argues that he spends only 5% of his time on his "primary duty" and that his job is mostly clerical. After defining the scope of his primary duty, Fairris adopts a contrary position and argues that his "primary duty" is actually the taking of customer complaints and other clerical or manual tasks. The court is not convinced by this argument. Despite Fairris's concession as to the scope of his "primary duty," the court reached an independent decision as to Fairris's "primary duty" based on the record at hand, Fairris's job duties taken as a whole, and on the importance of the "primary duty" to Fairris's employer. *See* 29 C.F.R. § 541.700(a). In reaching the determination as to Fairris's "primary duty," the court considered the amount of time spent by Fairris on other job related activities; yet, time so spent is not dispositive of an employee's "primary duty." *See* 29 C.F.R. § 541.700(b). The court is persuaded that Fairris's "primary duty" is not the performance of clerical or manual labor despite the evidence that Fairris only devotes 5% of his time to the operation of the water testing lab and backflow program. *See Moore v. Tractor Supply Co.*, 352 F.Supp.2d 1268 (S.D. Fla. 2004) (holding that a retail store manager's "primary duty" was management despite the fact that the manager spent 95% of his time on tasks that were collateral but unrelated to management).

In light of Fairris's "primary duty," Fairris's position of Environmental Coordinator for Bessemer Utilities is work requiring advanced knowledge. Defendants argue that the Environmental Coordinator position is predominately intellectual in character in that the job "requires 'constant and complete knowledge of perpetual revisions of requirements and regulations imposed for security, quality of water and efficiency of operation as imposed by Government Agencies'" and "requires a degree in Chemistry, Engineering or Industrial Management and at least three years of environmental work experience."  (Defendants' Brief in Support of Summary Judgment, p. 22).  Fairris argues that a comparison of the amount of time he spends on various clerical tasks with the percentage of time he spends on his "primary duty" reveals that Fairris's job is not work which requires advanced knowledge.

Fairris's argument misses the mark.  The question before the court is not whether Fairris's job duties, when taken as a whole, are intellectual in character. Under the learned professional exemption, the court must only look at whether Fairris's "primary duty" satisfies the three factor test of § 541.301(a).

Defendants are correct that Fairris's "primary duty" requires advanced knowledge.  Contrary to Fairris's argument, he is not similar to an assembly line worker in that Fairris does not simply take water samples and pass them along to

others for analysis.   Fairris must exercise regular and relatively unsupervised discretion in the performance of his "primary duty" as Fairris is ultimately responsible for the water sampling process and the backflow program.  Each requires advanced knowledge of water testing and analysis as well as advanced knowledge of constantly evolving state and federal laws and regulations.[5]  Fairris must also be licensed to perform his "primary duty," and continuing education is a requirement for maintenance of his license. Fairris engaged and regularly engages in study to learn the intricacies required by his "primary duty."  As such, Fairris's "primary duty" is distinguishable from the "performance of routine mental, manual, mechanical or physical work."  29 C.F.R. § 541.301(b).  Fairris's "primary duty" satisfies the first prong of § 541.301(a).

As to the second prong of § 541.301(a), "The phrase 'field of science or learning' includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not

---

[5]The fact that Fairris cannot operate outside the confines of those laws and guidelines does not detract from his exercise of discretion.

in a field of science or learning." 29 C.F.R. § 541.301(c).  Fairris's "primary duty" is not in a "field of science or learning."

Defendant maintains that, because Fairris's degree in Industrial Management was awarded by Auburn University's College of Engineering, Fairris is an engineer. It is well established that an engineer who performs a "primary duty" related to engineering would operate within a "field of science or learning."  However, the evidence does not support Defendant's contention.  The record establishes that Fairris, by virtue of his degree, is not an engineer nor can he seek to become a licensed engineer.  The undisputed evidence in this case is that Fairris's degree essentially qualifies him to be a professional business manager.

In the alternative, Defendant contends that the tasks of operating the water sample lab and the backflow program are related to a "field of science or learning" in that: (1) Fairris's "responsibilities and duties include legal and environmental compliance;" and (2) Fairris's job requires a bachelor's degree in Chemistry, Biology, Engineering, or Industrial Management.   (Def. Br. in Support of Summary Judgement; p. 23).  Defendant does not provide any analysis as to these arguments.

Defendant's first argument is without support.  Fairris's "primary duty" does not fit within the list of traditional professions articulated in 29 C.F.R. § 541.301(c). In addition, the parties have not cited to, and the court is unaware of, any authority

for Defendant's proposition that an employee is engaged in a "field of science or learning" solely because that employee's "primary duty" requires compliance with the law. Therefore, Fairris's duty of ensuring compliance is not, as Defendant argues, *per se* related to science or learning.

Defendant's second argument is likewise without merit. Fairris's "primary duty" is not related to a field of science or learning simply because his job description requires a bachelor's degree in Engineering, Biology, Chemistry, or, in the alternative, in Fairris's field of Industrial Management. The evidence establishes that Fairris's "primary duty" is not related to his degree. As discussed *supra*, a bachelor's degree in a discipline that is unrelated to one's primary duty is insufficient to establish that the learned professional exemption applies.

Accordingly, for the reasons stated, Fairris cannot meet the second prong of the test articulated in § 541.301(a), and Fairris does not qualify for the learned professional exemption.

Assuming, *arguendo*, that Fairris satisfied the second prong of § 541.301(a), Defendant has not met its burden to show that Fairris fulfills the third requirement that his "advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." "The phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to

23

professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d). "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." *Id*.

Contrary to Defendant's position, the intellectual demands of Fairris's job are not akin to the work of a physician, attorney, or engineer in that Fairris's responsibilities are not of the sort which require extensive, specific pre-professional study. One is qualified to perform the job of Environmental Coordinator if one possesses a bachelor's degree in one of four distinct academic diciplines. Notably, physicians and attorneys must have obtained doctorate degrees in their specific fields of study prior to entering the profession. In the case at bar, there is no evidence on record that Fairris uses his degree in carrying out his primary duty. Rather, Fairris falls within the category of professionals who have advanced degrees and who do not use those degrees in the performance of their jobs. Such employees generally do not fall within the learned professional exemption. *See, e.g.,* 29 C.F.R. § 541.301(e)(7). Furthermore, Fairris's participation in continuing education for the purpose of maintaining his license is insufficient to establish that his advanced knowledge was acquired by a prolonged course of specialized intellectual instruction. Defendants have not met their burden to show that Fairris meets the requirement of the third

24

factor under § 541.301(a).   As such, Fairris does not qualify for the learned professional exemption.

In addition, it is noteworthy that no party has cited, nor is the court aware of, any case in which an employee, similarly situated to the Plaintiff, has been found by a court to fall within the learned professional exemption.   While 29 C.F.R. § 541.301(f) contemplates that the list of professionals who will generally qualify for the exemption should expand as new professions and areas of specific study are developed and mainstreamed, the instant action does not present the need for such an expansion.

For the foregoing reasons, Defendant has failed to meet its burden of demonstrating that Fairris qualifies for the learned professional exemption.

## B.     The Administrative Exemption

The FLSA's implementing regulations provide employers with two tests by which to prove that employees fall under the administrative exemption: (1) the "long test," which applies to employees paid on a salary or fee basis at a rate of not less than $155 per week; and (2) the "short test," which applies to employees paid at a rate of not less than $250 per week. *Bagwell v. Florida Broadband*, 385 F.Supp.2d 1316, 1322 n.4 (S.D. Fla. 2005).   In the case at bar, it is undisputed that Fairris earned in excess of $250 per week.   Therefore, the court will examine Defendant's argument

under the short test.

The administrative exemption "short test" provides that an employee can be classified as an exempt administrative employee if: (1) the employee is paid a salary of not less than $250 per week, (2) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business of the employer, and (3) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. *See Bagwell*, 385 F.Supp.2d at 1322; *see also Wombles v. Title Max of Alabama, Inc.*, 2005 WL 3312670, *5 n. 4 (M.D. Ala. 2005).

As discussed *supra*, Fairris's "primary duty" is to oversee and operate the water quality testing lab and backflow program at Bessemer Utilities. The court finds that, based on the record, Fairris's "primary duty" is administrative in nature.

The next inquiry is whether Fairris's primary duty is "directly related to management policies or general business operations of the employer." Section 541.201(a) of the Secretary's Interpretations explains the phrase "directly related to management policies or general business operations of his employer or his employer's customers" as follows:

> (a) The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative

operations of a business as distinguished from "production" or, in a retail or service establishment, "sales" work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

29 C.F.R. § 541.201(a).

Thus, in order for the exemption to apply, Fairris's work must relate to the administrative operations of Bessemer Utilities and must be of substantial importance to the management or operation of Bessemer Utilities.

The court turns first to assessing whether Fairris's work as the Environmental Coordinator for Bessemer Utilities relates to its administrative operations. 29 C.F.R. § 541.201(b) identifies the administrative operations of a business:

(b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for, example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control. An employee performing such work is engaged in activities relating to the administrative operations of the business notwithstanding that he is employed as an administrative assistant to an executive in the production department of the business.

29 C.F.R. § 541.201(b).

In the instant case, Fairris engages in advising management through his reports to his superior and to the Mayor of Bessemer. Fairris is also ultimately responsible for the operation and supervision of his department. Planning, negotiating with

27

customers, and conducting research are each integral to Fairris's job. Fairris's duties with regard to the backflow program, in particular, involve finding solutions to certain health and safety problems of Bessemer Utilities and its customers. Accordingly, in consideration of the foregoing, the court finds that Fairris is engaged in activities relating to the administrative operations of Bessemer Utilities.

The court now turns to whether Plaintiff's work is of "substantial importance" to Bessemer Utilities. "It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business." *Bagwell*, 385 F.Supp.2d at 1324.

> As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

*Bagwell*, 385 F.Supp.2d at 1324-1325 (quoting Interpretation 29 C.F.R. § 541.201(c)) (internal marks omitted) .

Here, Bessemer Utilities sells residential and commercial water service to the

general public, and a primary concern of Defendant is maintaining and distributing uncontaminated water. Fairris's "primary duty" is, in part, related to ensuring that Defendant's water supply remained uncontaminated thereby allowing Defendant's water service to function reliably. The evidence is clear that Fairris is responsible for a protection system, specifically the backflow program, that prevents contaminates from entering into the public water supply. Fairris works at a responsible level and performs work directly related to management policies or the operation of Bessemer Utilities. The court concludes that the nature of Fairris's work as the Environmental Coordinator is of "substantial importance" to Defendant.

Having found (1) that Fairris's primary duty is concerned with developing, improving, and making Defendant's water system function safely and reliably, and (2) that this activity is directly related to the management policies or general business operations of and of substantial importance to Bessemer Utilities, the court concludes that the Environmental Coordinator position satisfies the second prong of the short test.

The third prong of the short test requires an analysis of whether Fairris used "discretion and independent judgment" in carrying out his duties. "To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." 29

29

C.F.R. § 541.202(a). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id*. "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id*.

> The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

> The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise

discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

29 C.F.R. § 541.202(c).

"An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." 29 C.F.R. § 541.202(f).

As detailed above, Fairris is the independent deciding authority with regard to the daily operations of his department. While Fairris is not authorized to spend significant sums of money without approval from his superior or from the Mayor of Bessemer, this restriction is not persuasive to the court that Fairris lacks the authority to exercise "discretion and independent judgment." In light of Fairris's primary duty,

the importance to Bessemer Utilities of Fairris's primary duty, the public health and safety concerns over which Fairris exerts considerable discretion, and Fairris's decision-making authority, the court concludes that Fairris exercises discretion and independent judgment, and so meets the third prong of the short test.

Having determined that the requirements of the administrative exemption are met, the court finds that Fairris is exempt from the overtime provisions of the FLSA. As such: (1) Plaintiff's Motion for Summary Judgment is due to be **DENIED**; and (2) Defendant's Motion for Summary Judgment is due to be **GRANTED**.  A separate Order will be entered consistent with this Memorandum Opinion.

**DONE** this the 11th day of May, 2007.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

32